(147 App. Div. 835.)

RANSOM v. RANSOM et al.

(Supreme Court, Appellate Division, First Department.   December 29, 1911.)

1. ATTORNEY AND CLIENT (§ 147*)—COMPENSATION—CONTINGENT FEES.
    Contingent fees may be based upon a percentage entirely dispropor-
tionate to what would be a reasonable compensation if not contingent.
    [Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 351;
Dec. Dig. § 147.*]

2. ATTORNEY AND CLIENT (§ 143*)—COMPENSATION—CONTRACT—WRITTEN CON-
    TRACTS—GOOD FAITH.
    In view of the fiduciary relation between an attorney and client, a
court of equity may inquire into the good faith of a written agreement
between them for compensation, notwithstanding Code Civ. Proc. § 66
(Judiciary Law [Consol. Laws 1909, c. 30] § 474), providing that the
compensation of an attorney for services is governed by an agreement,
express or implied, which is not restrained by law, though a written
agreement should not be set aside unless there has been a misrepresenta-
tion or suppression of facts by the attorney or undue influence by which
he has obtained an unconscionable advantage.
    [Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§
328-331; Dec. Dig. § 143.*]

3. ATTORNEY AND CLIENT (§ 124*)—ASSIGNMENT TO ATTORNEY—VALIDITY—
    COMPENSATION—EVIDENCE.
    Evidence in an action by an attorney to have adjudged valid an as-
signment of a part of an estate as compensation for his services in re-
covering the estate for defendant under a written contract of employment
held to show that defendant ratified the written contract with knowledge
of all the facts.
    [Ed. Note.—For other cases, see Attorney and Client, Dec. Dig. § 124.*]

4. ATTORNEY AND CLIENT (§ 147*)—COMPENSATION—REASONABLENESS OF CON-
    TRACT.
    Upon the death of defendant's husband, she was unwilling to use her
own money for legal services in asserting her claim to a share in her
deceased husband's estate until plaintiff, an attorney and former ad-
viser, repeatedly urged her to assert her claim and offered to conduct all
litigation necessary to determine her interest in such estate, which he
believed to be $400,000, for 25 per cent. of the amount recovered for her
upon condition that she was to pay nothing for his services if he re-
covered nothing.  The agreement finally executed between them to that
effect was read over to plaintiff in the presence of a third person, and
she signed it understandingly with knowledge of a former decision of
the Appellate Division in connection with the same estate which, if sus-
tained, would entitle her to recover, and with knowledge of the amount
of plaintiff's fee and without any undue advantage by plaintiff; he hav-
ing repeatedly asked her to consult a third person for advice before
making it.   Afterwards plaintiff, at defendant's request, reduced the
amount of his fee 5 per cent.  Held, that it could not be said that the
fee contracted for was unreasonable, so as to require the court to set
aside the contract upon plaintiff's recovery of the full amount contem-
plated.
    [Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 351;
Dec. Dig. § 147.*]

    Ingraham, P. J., and McLaughlin, J., dissenting in part.

Appeal from Special Term, New York County.

Action by Albert W. Ransom against Edith M. Barker-Ransom
and others.  From a judgment at Special Term for defendants (70

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Misc. Rep. 30, 127 N. Y. Supp. 1027), plaintiff appeals. Reversed, and new trial ordered.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, MILLER, and DOWLING, JJ.

George W. Alger, for appellant.

George P. Breckenridge and Henry Bacon, for respondents.

DOWLING, J. The plaintiff, who is an attorney and counselor at law, brings this action to have adjudged valid a certain assignment by defendant of part of her interest, both principal and income, in the residuary estate of George Bell, deceased, and to enforce his rights thereunder. George Bell died on December 9, 1881, leaving a last will and testament, wherein, among other things, he provided that the net income of his residuary estate should be divided by his trustees between his nephews George Barker and Charles Barker and his niece Mary Leavitt, share and share alike, during the life of his daughter Catherine B. Bell, less such sum not exceeding $15,000 per annum as the trustees might deem necessary for the support and maintenance of his daughter, and, upon the death of his daughter leaving no lawful issue her surviving, the residuary estate was devised and bequeathed in equal shares to his said nephews and niece. Catherine Bell, the daughter of the decedent, is still living and is of the age of 70 years, unmarried and incompetent, a committee of her person and property having been appointed, and she was incompetent at the time of her father's death. His estate amounted to upwards of $1,000,000. The proper construction to be given to the will had been a matter of controversy for some years and litigation had ensued; among the questions there involved and bitterly contested being (1) whether the interest of the nephews and niece under the will was a vested or a contingent one, and (2) whether such interest was alienable. One of the nephews, Charles Barker, claimed that the interest was contingent and inalienable, in order to defeat a certain assignment of an interest therein made by him, and the executors of the Bell estate, of whom George A. Barker was one, sustained him in that contention. The matter had not been finally adjudicated when George A. Barker, the nephew of Bell, on October 1, 1906, married the defendant Edith M. Barker-Ransom, who had been his housekeeper for 16 years. Within a few days thereafter he made his will leaving everything, including his interest in his uncle's estate, to his wife. On January 27, 1907, George Barker died, and, his will having been offered for probate by his wife, it was contested by his daughters Lizbeth Bell Scott and Ethel I. Barker.

The plaintiff had been an office associate of Mr. Tarrant Putnam, who was attorney for George Barker as one of the trustees of the Bell estate; that having been the sole business of Barker for the 25 years preceding his death. Plaintiff, by reason of his association with Mr. Putnam and his participation in various litigation, became acquainted with the details of the estate and of the interests of the various parties therein, and had earned the confidence of Mr. Barker, whose will he had drawn, and who advised his wife that the plain-

tiff would be a good man to advise her; so that, when the daughters opposed the probate of the father's will, she retained the plaintiff as her attorney. The will was admitted to probate in March, 1907, and plaintiff was paid by Mrs. Barker for his services in that proceeding. Thereafter plaintiff conferred with Mrs. Barker regarding her interests under her husband's will, and she was advised by plaintiff that the next thing to be done was to establish the interest of George Barker in the Bell estate. Mrs. Barker demurred to so doing, saying that her husband had always told her that there was nothing to it, as he would have to outlive Catherine Bell before he would get anything. To this plaintiff replied that he had previously been of that opinion, but he had changed his view, and that there was considerable to it, to which she replied that she did not want to bother, and did not want to waste any money, and proposed to keep the money she had. Plaintiff told her that she was foolish not to assert her claim for the interest in the Bell remainder. But she replied "No"; that she proposed to keep what she had. Mrs. Barker then inquired whether some arrangement could not be made by plaintiff to take up this matter, and thereafter he proposed to represent her interests on a contingent basis of 25 per cent. to which she replied, "Very well. That is satisfactory." Plaintiff then suggested that she talk it over with somebody, and write to her brother Alfred, which she refused to do, saying she wanted to talk it over with nobody, as she was satisfied. Plaintiff then promised to prepare a contract in accordance with this arrangement. But there was some delay in doing so, and it was not prepared until some two months afterwards, in May, 1907. Plaintiff claims that he repeatedly asked Mrs. Barker to consult some one about it, suggesting and furnishing names of persons with whom she might confer, all of which she refused to do. At this time Mrs. Barker was the possessor in her own right of cash to the extent of $50,000, $45,000 of which represented the proceeds of the sale of real estate at Baldwins, L. I., given to her by her husband; the remaining $5,000 being the amount realized from the auction sale of furniture and personal effects upon the same property. She appears to have had no obligations of any kind. Frequent interviews were held between plaintiff and Mrs. Barker during this period, averaging five times a week, until June 2, 1907, when she wrote plaintiff a letter informing him that, as she was about to go away towards the end of the week to be operated upon, she wanted "to have that contract signed and my will made before going, and do not wish you to put this off any longer." Plaintiff then invited her to come to his office, which she did, and he again asked her to consult somebody about the agreement, which she refused to do. The plaintiff reiterated his desire that she should advise with some disinterested party, but, upon her continued refusal so to do, he finally suggested that she go with him to see the president of the Broadway Savings Bank, in which institution she was a depositor, and to this she acceded.

Plaintiff and Mrs. Barker went to the president's private room, and in his presence the agreement was read over to Mrs. Barker, to-

gether with the collateral assignment which accompanied it. Mrs. Barker then said that she was satisfied with the agreement without going over there; but, as Mr. Ransom had insisted upon her going to a third party, she had come over to please him. Mrs. Barker then signed the agreement, and acknowledged it before the bank notary, and at the same time, on June 4, 1907, executed and acknowledged in the same way an assignment of her interest in the George Bell estate to the extent of $100,000. Mr. Ransom then claims to have given her a copy of the contract. This agreement recites the death of George Bell and the probate of his will; the death of George Barker and the probate of his will, the terms of which are therein set forth; the fact that doubts have arisen as to whether the remainder set forth in a certain paragraph of the will of George Bell and limited to George A. Barker after the death of Catherine Bell is contingent or vested, also as to the right of Barker to dispose of the same and of any other interest in said will remaining after his death; that the claim of the widow is disputed; that appropriate action is about to be commenced for the judicial construction of the disputed provision, and for an adjudication as to the interest of Mrs. Barker in the Bell estate, derived through the will of her deceased husband or otherwise; that the accounting by Barker of his transactions as trustee of the estate would be required; that it was apprehended that divers actions and proceedings would be instituted arising out of the administration of the Bell estate which would affect the ultimate rights of Mrs. Barker; that Mrs. Barker, in view of the possible failure of a final adjudication in favor of her interests, was not willing to incur expenses for extended legal services which might be required; that she preferred to preserve her separate estate and funds and to make more liberal compensation, but only in the event of success in having an adjudication as to her rights in the property of the said estate of George Barker determined in her favor; that it was mutually represented that the estate of George A. Barker, save what it might receive under the said will of George Bell, deceased, was insolvent, and that Mrs. Barker could not receive anything therefrom with which to meet the expenses of litigation; that Mrs. Barker was desirous of having plaintiff herein represent her interests and render services, counsel, and advice, and to pay therefor contingently upon establishing her right in and to such property based upon a percentage of her interest whether under the will of her husband or by intestate succession; and that it was mutually represented that the value of the interest in the Bell estate claimed by Mrs. Barker was believed to amount approximately to $400,000 in principal, together with the income thereon accruing during the lifetime of Catherine B. Bell. Then followed provisions by which Mrs. Barker retained and employed Mr. Ransom to act as her attorney and counsel in any and all suits which it might be necessary or advisable for him, acting in her behalf and interest, to commence, or which might be commenced against her affecting in any wise her rights in and to any of the property of George Bell, deceased, whether in remainder or otherwise, and she agreed to pay him the sum of 25 per cent. of the finally de-

termined value of the remainder of the amount of said remainder adjudicated to or received by her, whether under said will of George A. Barker, or as widow by intestate succession and distribution, and also 25 per cent. of any and all income accruing and payable on any such principal since the death of George A. Barker, and until the principal shall become due and payable.

Plaintiff in consideration thereof agreed to render and perform all legal services in any and all suits and proceedings instituted by or against Mrs. Barker affecting in any way her rights and interests in any property of the Bell estate, including the accounting by Mrs. Barker as representative of her husband's estate of his acts as trustee of the Bell estate, and any services in any wise relating to these matters, including counsel, advice, and negotiations; and, in the event of a final determination in favor of Mrs. Barker, to perform all the legal services affecting her interest in the estate, to and including final accounting and distribution. The agreement contained a further clause that, in the event of it being finally determined that Mrs. Barker had no interest in the remainder, Mr. Ransom was to make no charges for such services as he might have performed under the agreement; it being understood between the parties that whatever compensation was received by Ransom for his services to be performed was not to be payable out of the separate estate of Mrs. Barker, but out of the property of the Bell estate if any was finally adjudicated to her. It was further recited that the assignment by Mrs. Barker of her interest in the estate of George Bell to the extent of $100,000 hereinbefore referred to was collateral, and not additional to this agreement.

At the time of the execution of this agreement, the status of the legal proceedings affecting the rights and interest of Mrs. Barker was as follows: An action had theretofore been brought by Gertrude Stringer against George A. Barker and Jacob Berry, as executors and trustees under the last will and testament of George Bell, deceased, et al., wherein plaintiff, claiming that under an assignment from Charles B. Barker of his interest in the George Bell estate to the extent of $100,000 principal and $5,000 annual income, sued to enforce her rights thereunder. The referee before whom the case had been tried, in passing upon the questions involved, had decided that the interest of Charles B. Barker, which was similar to that of George A. Barker, was a vested remainder, and the Appellate Division in December, 1905, in disposing of the appeal, intimated that such question was not directly involved therein, although in its opinion it said that, if the decision of that question was necessary to the judgment that the assignment was valid and effective, they would be inclined to hold likewise. 110 App. Div. 37, 96 N. Y. Supp. 1052. An appeal was taken from this decision and was pending at the time of the making of the agreement in question. George A. Barker in his lifetime had joined interests with his brother in the Stringer suit, and by his answer as trustee of the Bell estate had set up that the interest of his brother under the Bell will was a contingent interest. This position, of course, if sustained, would have determined his own to

be a similar contingent one only, and is in harmony with his attitude in relation to the construction of the Bell will down to the time of his death and with his widow's statement as to what he had told her of the nature of his interest. There was also pending an action brought in the Supreme Court of Westchester county, wherein Lizbeth Bell Scott, one of George Barker's daughters, sought a construction of the Bell will, so far as it related to the remainder thereby given to her father, in which action Mrs. Barker had defaulted before her agreement with plaintiff. There had also, at this time, been brought an action by the daughters of Barker to set aside the probate of their father's will.

It is plaintiff's contention that he called Mrs. Barker's attention to the decision of the Appellate Division regarding the proper construction of the Bell will, and the learned court at Special Term by its decision has found that the agreement in question was executed by the defendant without the practice upon her of any fraud, misrepresentation, or concealment by the plaintiff, although he has also found that plaintiff had not stated to the defendant the actual conditions which existed with respect to her husband's interest in the Bell estate, and regarding actual work necessary to be done to protect her rights with sufficient fullness to make her clearly understand the whole situation.

The plaintiff then began to render services as attorney and counsel for Mrs. Barker in both the Bell and Barker suits. In the case of Stringer v. Young, representing her, he filed a brief in the Court of Appeals reversing the position theretofore uniformly taken by George Barker, and urged that the share of Charles Barker, instead of being a contingent remainder, was a vested interest. The Court of Appeals (191 N. Y. 157, 83 N. E. 690) in February, 1908, determined that the interest of the nephews was a vested interest, and not a contingent one. Plaintiff commenced an action on behalf of Mrs. Barker for an accounting and construction of the Bell will in the county of New York, but the suit of Young v. Barker, hereinbefore referred to, was tried instead. Young v. Barker was an action brought by the trustees of the Bell estate in Westchester county for the settlement of their accounts and for a construction of the Bell will as to the Barker remainder in which final judgment was entered May 7, 1909. Upon the accounting part of this action plaintiff prepared the accounts of George Barker as trustee of the estate and the trustees accounted generally. There were numerous controversies as to the rights of the respective parties, and the contentions of Mrs. Barker were fully sustained, an appeal from such judgment having since been affirmed. 141 App. Div. 801, 127 N. Y. Supp. 211. There was also a proceeding, "In the Matter of Leavitt," brought to secure the appointment of an additional trustee. Plaintiff also represented Mrs. Barker in the action brought by the daughters in the Supreme Court to revoke the probate of their father's will, being the suit known as Scott v. Barker. The will was attacked upon the grounds of lack of mental capacity, fraud, and undue influence, and, after a lengthy trial, the jury found a verdict setting aside the probate of the will, which judgment was reversed upon appeal and a new trial

ordered. Scott v. Barker, 129 App. Div. 241, 113 N. Y. Supp. 695. Thereafter a settlement was effected by plaintiff under which each of the daughters received a one-tenth share of their father's interest in the Bell estate, and this was consummated in January, 1909. Down to this time there had been no expression of disapproval upon the part of the client with any of the plaintiff's services in her behalf, and she did express her satisfaction therewith verbally and in writing. A letter is in evidence written when the negotiations for the settlement with the daughters was pending, in October, 1908, in which plaintiff advised her at great length of her rights in the matter of that contest and furnished her a very full and complete statement of the status of affairs. In reply to this Mrs. Barker wrote plaintiff expressing her satisfaction, saying that "no better arrangement could be asked for than had been made," and thanking him for the loyalty he had shown her, and for his patience and wise guidance. It appears, however, that during the trial of the Barker will case her agreement with plaintiff had become a part of the record of the trial, and had been commented upon by the attorney for the daughters. It was discussed by her friends and with her brother, as well as with her present husband, who was an attorney, all of whom advised her as early as March, 1908, that it was a very exorbitant contract. About this time she obtained a copy of the contract from plaintiff to show it to some one. In spite of all this, she wrote plaintiff on April 12, 1908, saying that "she thought she would drop him a line in regard to the contract as there was so much talk about it"; that she wanted him to rest assured that she was perfectly satisfied with it and with everything that had been done for her. After the settlement had been consummated with the daughters of George Barker in January, 1909, Mrs. Barker suggested the execution of a new assignment to plaintiff in view of that settlement, saying, "It might as well be fixed up at the same time." Plaintiff then said that he thought a fair construction of the contract would be to give him 25 per cent. of the Barker remainder in the Bell estate, after deducting the 20 per cent. which he had just assigned to the daughters. He said, however, that he had performed services for her, not covered by the original contract, including miscellaneous personal services, and also the defense of the action brought to set aside the probate of the Barker will, which he claims to have been outside the scope of the original agreement. He therefore proposed that she give him 25 per cent. of the gross share of the Barker remainder in payment for all his services of every kind and nature. To this she assented, but he told her to think it over. Some five or six days later she returned and told him that she had thought it over, and that it was all right, whereupon he agreed to prepare the assignment. The following day she returned to execute it, but said before doing so she wanted to have prepared by him a statement of transactions between them covering certain financial dealings between them. Such a statement was dictated and furnished in writing by plaintiff to her, and she never questioned it as being correct until the present action was commenced. This statement of transactions included what was said to be the true interpreta-

tion of the original agreement, together with the terms of the new agreement about to be executed. Upon the receipt thereof the assignment was read to her, and she expressed her satisfaction with it, and on January 27, 1909, signed and executed the same, whereby she conveyed to plaintiff a one-quarter interest in and to the entire residuary estate of her husband under the Bell will, subject to the proportion of the transfer taxes thereupon, and a like interest in the net income upon said share from the death of her husband until the death of Catherine B. Bell.

Upon the following day plaintiff furnished her with a typewritten copy of this statement of transactions. The first date when defendant made any complaint to plaintiff regarding the extent of his compensation appears to have been on May 6, 1909, when she called upon plaintiff, and told him that she was not satisfied with the percentage she was to pay him, and asked him to reduce the amount of the contract. Plaintiff did reassign to her a 5 per cent. interest out of the 25 per cent. which he was to receive, leaving him with 20 per cent. of the Barker remainder. Plaintiff did that to make the transactions satisfactory to her, and, while Mrs. Barker in one answer states that it was satisfactory to her at that time because it was all she could get from him, in the next answer she says that it was satisfactory, but she did not tell him so, but only said: "If that is the best you can do, all right. I will have to take it." The reconveyance of the 5 per cent. to her by the plaintiff was made on May 7, 1909, at which time she paid him a consideration of $2,500 for the execution of the reassignment. At the same time she requested him to cancel the collateral assignment, which was done. On June 15, 1909, Mrs. Barker discharged plaintiff as her attorney, and notified him that Rollin M. Morgan would represent her in his stead.

On June 30, 1909, she married Perte V. Ransom. In July, 1909, she repudiated the assignment in question, and notified plaintiff of her refusal to be bound thereby. In her answer the defendant sets up various defenses to the agreement sued upon, among others that she was ill when she signed the assignment, and that plaintiff had fraudulently represented to her that it was fair and equitable and due him that it should be signed; but it sufficiently appears that she was fully aware of the nature of the paper she was signing, that no fraud was perpetrated upon her, and that she signed it freely and voluntarily. This applies to both the assignments executed by her.

At the close of the plaintiff's case defendant offered to stipulate that the court should decide upon a quantum meruit the amount of the plaintiff's recovery and tendered judgment for $22,000, less the amount already paid the plaintiff, being at the rate of $50 per day for the period of time that Mrs. Barker's affairs were in his hands. This being declined by the plaintiff, after some discussion, defendant was allowed to amend her answer by alleging that the agreement in suit was an agreement between attorney and client, and that the court should allow what it considered to be equitable under the circumstances for the services rendered. Under this amendment of the pleadings, the learned court finally determined, in view of the cir-

cumstances, that a contingent fee of 7½ per cent. would have been fair and adequate for all the services performed by plaintiff, except those in the case of Scott v. Barker, and that, inasmuch as plaintiff had been discharged by defendant before the expiration of the services agreed to be performed by him, for what services he had rendered he should receive a percentage of .05625 of Mrs. Ransom's share, less what he had been paid on account. In so determining the court disregarded the will contest, which constituted the most important services of the plaintiff, as the court found, and which it said would have justified a much higher percentage; and this it did because of plaintiff's contention that such services were not included in the original agreement.

The judgment appealed from herein did not set aside or declare invalid the assignment upon which the action was brought, but proceeded upon the theory that, as plaintiff had come into a court of equity, he could obtain a decree for only so much as equitable doctrines permit. The leading case relied upon is Whitehead v. Kennedy, 69 N. Y. 462, wherein the court said:

"The plaintiff on the trial assumed the burden of proving that the agreement of October 25, 1865, was just and fair, having in view the general principle that an attorney who seeks to avail himself of a contract made with his client is bound to establish affirmatively that it was made by the client with full knowledge of all the material circumstances known to the attorney, and was in every respect free from fraud on his part, or misconception on the part of the client, and that a reasonable use was made by the attorney of the confidence reposed in·him. The general principle is firmly established and universally recognized."

To the same effect are Place v. Hayward, 117 N. Y. 187, 23 N. E. 25, and Nesbit v. Lockman, 34 N. Y. 167. But the first case cited was one where the services for which the assignment was given were past services, and the court expressly refused to determine how far section 303 of the Code changed the rule when the services were prospective. The two latter cases are those of a gift by client to attorney and of an assignment given to secure an alleged debt. The court expressly refused to set aside the present assignment for all purposes and to settle plaintiff's fees upon a quantum meruit basis, holding that this would be inequitable, but enforced the assignment only to the extent to which it deemed the compensation warranted by the services rendered.

[1] The learned court expressly recognized the propriety of contingent fees based upon a percentage basis, although it be altogether disproportionate to what would be reasonable compensation for the lawyer's services if paid for in cash when rendered. As he said in his opinion:

"Not only is there long delay in recovery, but services covering years may never be compensated at all. I think that the contingent fee should often be approved, not only in the case of the penniless litigant, but also in the case of the litigant in the position of Mrs. Barker, possessed of but moderate means. One so situated should be able to arrange with some attorney in such a way that, if unsuccessful, her own funds should remain altogether intact or be diminished only by a moderate retainer; while, in return for the risk that his services may thus be thrown away or only in small part

compensated, he has a chance of receiving an amount much greater than their cash value. In fact, when a lawyer sues his client upon a quantum meruit the law as laid down by our courts makes the fee largely contingent upon success. Randall v. Packard, 142 N. Y. 47, 36 N. E. 823. * * * The contingent fee has long been sustained, not only in this state (Fowler v. Callan, 102 N. Y. 395 [7 N. E. 169]), but by the Supreme Court of the United States also (Wylie v. Coxe, 15 How. 415 [14 L. Ed. 753]; Stanton v. Embury, 93 U. S. 548 [23 L. Ed. 983]; Ingersoll v. Coran, 211 U. S. 335 [29 Sup. Ct. 92, 53 L. Ed. 208])."

[2] Section 66 of the Code of Civil Procedure as it existed when this agreement was entered into read as follows, so far as is material to the question herein involved:

"The compensation of an attorney or counsellor for his services is governed by agreement, express or implied, which is not restrained by law." Now section 474 of Judiciary Law [Consol Laws, c. 30].

The source of this provision is section 303 of the Code of Procedure, providing in part:

"All statutes establishing or regulating the costs or fees of attorneys, solicitors and counsel in civil actions, and all existing rules and provisions of law, restricting or controlling the right of a party to agree with an attorney, solicitor or counsel for his compensation, are repealed; and hereafter the measure of such compensation shall be left to the agreement, expressed or implied, of the parties."

It is not claimed that the agreement in question is restrained by any provisions of the statute law, but that, the interest assigned being disproportionate to the services rendered which formed the consideration for its execution, the court has power to modify or annul it. The relation of attorney and client is one which creates a degree of trust and confidence upon the part of the latter in the former which is only natural and necessary, and of which no attorney should be permitted to avail himself to his profit and to the client's loss. The attorney is an officer of the court, and, when he actively seeks its aid in the assertion or protection of his rights in any manner against his client, he should be prepared to establish his good faith and honesty in the transaction, and be required to do so. Not only does his client trust him, but he has come for advice, which he is prepared to follow, upon matters of which he knows little or nothing. The selection of an attorney is a matter of personal choice, but the confidence reposed in him should exist because of the professional relationship. Hence it cannot be said, even in view of the plain phraseology of the code section, that the court is without power to inquire into the good faith of an agreement between attorney and client, even if reduced to writing. But, when parties are free to contract, their agreement should not be set aside unless fraud has been perpetrated, undue influence exerted, material facts affecting the subject-matter misrepresented or suppressed, or advantage taken of a position of confidence and trust to obtain an unconscionable advantage over the party. So in Werner v. Knowlton, 107 App. Div. 158, 94 N. Y. Supp. 1054, it was said, in an action brought to recover for the value of professional services fixed by express contract, approving of a refusal in effect to charge the jury that plaintiffs could not recover unless the jury approved of the rate

of compensation fixed and would have been willing upon a quantum meruit to allow the compensation agreed upon:

"We do not think that an attorney who expressly fixes the rate of compensation of the client, in the absence of some evidence of fraud or overreaching, is compelled to submit the validity and binding force of his agreement to any such test as this. Section 66 of the Code of Civil Procedure expressly provides that the compensation of the attorney or counsellor for his services is governed by agreement, express or implied,.which is not restrained by law. If the contention of the counsel for the appellant upon the facts as developed in this case is correct, it would be entirely useless for an attorney to make an agreement fixing his compensation. Any agreement which he and his client might make fixing for the protection of both the value of the services to be rendered would always be subject to revision and modification by a court or jury which might entertain a different idea of value."

In Ransom v. Cutting, 112 App. Div. 150, 98 N. Y. Supp. 282, affirmed 188 N. Y. 447, 81 N. E. 324, an agreement to pay a contingent of 10 per cent. was held neither champertous nor unconscionable. The court said:

"An attorney or counsellor at law by express provision of statute can agree with his client as to the amount to be paid for services to be rendered (section 66 of the Code of Civil Procedure), and an agreement made for that purpose, in the absence of evidence showing that a fraud had been perpetrated on the client, or that he did not fully understand the purport of the agreement, must be enforced like other contracts according to its terms. The statute gives the right to an attorney and client to make a contract as to the former's compensation, and it is a matter of no importance, when the contract is brought under review, what the compensation to be paid is, providing the contract is legal in other respects. The court cannot make contracts for parties, and only has the power to construe them as made. If the contract as made were the result of a fraud practiced upon the client, or if it appeared that the compensation were so excessive, in view of the services rendered as to indicate that an improper or undue advantage had been taken of the client, relief would be afforded."

In McCoy v. Gas Engine & Power Company, 135 App. Div. 771, 119 N. Y. Supp. 864, it was said:

"The word 'unconscionable' has frequently been applied to contracts made by lawyers for what were deemed exorbitant contingent fees, but by that nothing more has been meant than that the amount of the fee standing alone and unexplained may be sufficient to show that an unfair advantage was taken of the client, or, in other words, that a legal fraud was perpetrated upon him. Morehouse v. Brooklyn Heights R. R. Co., 185 N. Y. 520 [78 N. E. 179]."

Matter of Friedman, 136 App. Div. 750, 121 N. Y. Supp. 426, affirmed 199 N. Y. 537, 92 N. E. 1085, was a case where a contract for 50 per cent. of a recovery in an accident case was held not to be fraudulent per se nor evidence of improper or undue advantage. As was said:

"One-half of a recovery as contingent payment for legal services may be more beneficial to the client than to the lawyer. There is no limit to the work he promises and must render, and his professional services and disbursements rendered and made by him at his peril, and he has a legal right to make an engagement that has in view the probabilities and hazards in such regard. This is not a question of ethics, of the highest professional proprieties, but of legal action."

In that case, however, the court found reasons for reducing the compensation to 25 per cent., plus the disbursements. In Murray v.

Waring Hat Manufacturing Co., 142 App. Div. 514, 127 N. Y. Supp. 78, an agreement to pay an attorney a contingent fee of 40 per cent. of the amount of any recovery or settlement was upheld, where a settlement had been had; the court saying it was marked with candor and good faith, was not unconscionable, and that:

"If the compensation seemed large when finally determined by the resistance of the defendant to the claim, it must be remembered that the compensation agreed upon was contingent and therefore properly larger than if absolute. and then, when entered into, the extent of the services required could not be forecast."

· All of these decisions are in accord with the Matter of Fitzsimons, 174 N. Y. 15, 66 N. E. 554, wherein a contingent fee of 50 per cent. was upheld. The court said:

"The statute conferred upon the parties the right to make the contract and conferred upon the court no authority to make it for them. If, however, upon a proper examination of the appellant's claim, it shall be found that the agreement between himself and his client was induced by fraud, or what the compensation provided for was so excessive as to evince· a purpose to obtain improper or undue advantage, the court may correct such abuse."

In the case at bar, none of these conditions exists. There is no proof of fraud, undue influence, misrepresentation or suppression of facts, nor can it be said that the amount is so large as to be unconscionable, even though it be 25 per cent. of a $400,000 estate, recovered after litigation. Mrs. Barker had ample funds of her own. She desired to retain them. She was unwilling to risk any part of them in asserting a claim to a share in an estate as to which her husband, one of its trustees, had taken a position different from that she was asked to take. She seemingly did not intend to do anything to enforce her rights, unless it could be done without risk of expense to her. Under these conditions, a contingent contract was a natural and proper one. The attorney may not have been able to make her realize all the legal difficulties or advantages in the future, but he advised her of the vital fact of the Appellate Division decision. She knew the extent of her prospective interest, and she knew how large the fee would be, for she executed an assignment to the extent of $100,000 of her interest to secure it. Not only did she not complain, but the agreement was drawn upon her insistence in writing. It was read to her and she understood it. She was repeatedly told to get independent advice, and would not do it. When she signed it, she did so before an outside notary, after it was read to her, in the presence of a disinterested witness, and after her protest that she only went there to please plaintiff, as it was satisfactory to her. The second agreement is equally unobjectionable from every point of view. In the interim she had talked the matter over with many people, and, while some told her she was paying too much, she never wavered in her belief that it was proper. Her present husband, an attorney, has been advising her from at least March, 1908. Even when she asked for a reduction on the contract in May, 1909, having had advice from outside friends for more than a year, she did not demand it as a right, but made a request, and accepted the 5 per cent. retransferred to her without protest and paid therefor $2,500.

[3] Such a contract as this can be ratified and adopted, with knowledge of all the facts, and Mrs. Barker repeatedly performed acts which constituted such ratification.

[4] Under all these conditions, it cannot be said that any reason had been shown for depriving the plaintiff herein of the agreed compensation for his services. He has secured for his client the favorable determination of her rights in the $400,000 estate, constituting her husband's remainder in the Bell estate. He has satisfactorily and successfully carried on the other matters intrusted to him and covered by his agreement. Neither as to the original agreement of June 7, 1907, or the substituted one of January 27, 1909, is there proof of either fraud, misrepresentation, suppression of the facts, or undue influence, nor can either be said to be unconscionable. Plaintiff was therefore entitled to the relief sought, but upon the present findings judgment cannot be directed in his favor.

The judgment appealed from must therefore be reversed and a new trial ordered, with costs to appellant to abide the event.

LAUGHLIN and MILLER, JJ., concur.

· INGRAHAM, P. J. (dissenting in part). Prior to the death of the defendant's husband, the plaintiff had been his attorney. He had been recommended to the defendant by her husband, and immediately after his death she placed all her affairs in the plaintiff's hands, and depended entirely upon him for legal advice. The dependence of the defendant upon the plaintiff deepened as the various litigations involving the estate of her husband's uncle, in which her husband was interested, and in relation to her husband's estate proceeded. Finally the time came when this agreement that plaintiff seeks to enforce was executed. The services which he undertook to render by this agreement related entirely to services to be rendered in relation to the Bell estate. At that time the opinion had been expressed by the Appellate Division in the Second Department that the remainder was vested, ·in which event the defendant's husband would have been entitled to about $400,000 from the Bell estate. The defendant was reluctant to involve herself in any expense in relation to the litigation in regard to the Bell estate, and the defendant proposed that plaintiff should take the case on a contingent fee. The plaintiff suggested a 25 per cent. fee, which, if the opinion of the Appellate Division were sustained, would mean to him for services that he was to render thereafter in relation to the Bell estate the sum of $100,000. The plaintiff was a young man, who had been in practice but a few years, with no extensive court experience and no experience in litigation of this character. He prepared an assignment of one-quarter of the defendant's interest in the Bell estate, which she executed. He prepared a long and somewhat intricate contract, which she signed. In fact, she signed everything that the plaintiff proposed, without question—as he says, almost resented the suggestion that she consult anybody else in regard to the making of the contract—quite conclusive evidence of the trust that she reposed in the plaintiff. The litigation in regard to the Bell estate continued, and the plaintiff's own statement of the

services that he performed shows how unimportant they were, and they certainly had no substantial influence upon the final result which determined that her husband was entitled to something like $400,000 from the Bell estate. Of course, it is not entirely just to look at a contract of this kind, controlled by knowledge of the subsequent developments. Undoubtedly the plaintiff undertook to render the services that were necessary to protect the defendant's interest in the Bell estate; but I cannot agree to the conclusion that, for a lawyer occupying the relation that the plaintiff did to the defendant, he was justified in asking her to agree to a contract which for any services that he could possibly render would result in a fee of $100,000. What he did in regard to this estate that was of any value to his client was to submit on the argument of the case in the Court of Appeals a brief of 11 pages. He did not even take the trouble to go to the Court of Appeals to argue the case. The other services that he performed were quite unimportant, and, once the main question had been decided, there was nothing to suggest that important legal services would be required. It is quite true that an attorney is authorised to make a contract with a person having a claim to be prosecuted for a fee contingent upon success; but where, before the contract is made and before the litigation arises, the relation existed showing the dependent condition of the client and the commanding position of the attorney, it seems to me that a contract made under those circumstances should be looked at, as are other contracts between attorneys and clients, and the burden placed upon the attorney of showing not only an absence of fraud, but that the contract was under all the circumstances a fair and reasonable contract for him to ask his client to execute. Here undoubtedly there was no fraud, no misrepresentations were made, and no threats were employed to induce the client to sign the contract. The plaintiff took remarkable precautions to make it appear that his client knew what she was signing, and that she signed voluntarily. The very precautions taken and the refusal of the defendant to take advice is evidence that she relied entirely upon the plaintiff, and was willing to accept anything that he proposed. When such conditions are shown to exist, it seems to me that it is the duty of a court of equity, when an attorney seeks to enforce such a contract, to place upon the attorney the burden of showing that, under the conditions existing when the contract was made, it was a fair and reasonable contract for an attorney to ask his client to execute. If this principle is supplied, it seems to me that the court in trying the case would have been justified in saying that to ask a client to pay him $100,000 for the services that could be rendered on behalf of the defendant in the litigation concerning the Bell estate was not a reasonable contract to be suggested by a person occupying the relation that the plaintiff did to the defendant. I think it is quite probable that the attempt of the court below to make a new contract for the parties, was not justified. What I think the court on the trial should do is to determine the reasonable value of the services rendered by the plaintiff to the defendant, based upon the fact that it was a contingent fee, and that his compensation was dependent upon success, a fee which would be much more liberal than one which was not so

contingent, and award to the plaintiff out of this estate such a sum as would liberally compensate him for the services which at the time the agreement was signed could reasonably have been expected would be required of him.   I will not dissent from the reversal of the judgment and the ordering of a new trial; but I do dissent from the decision about to be rendered which holds, upon these facts, as a matter of law, that the plaintiff is entitled to enforce this contract and receive from this woman $100,000 for the services which he rendered, or which any one could reasonably anticipate would be necessary to be rendered at the time this contract was made.

McLAUGHLIN, J., concurs.