Jacob Markowitz, J.
The 1 ‘ Sound of Music ’ ’, a play with music and lyrics by Rodgers and Hammerstein, book by Lindsay and Crouse, and produced by Hayward and Halliday, world *700 famous for its words and its music, fantastically successful, and made into a movie about to be re-released, spawned this litigation.
BACKGROUND:
The play was produced under a contract dated July 20, 1959 between Hayward and Halliday and Rodgers and Hammerstein and Lindsay and Crouse. Exploitation rights to the play were eventually assigned to the Sound of Music Company, a limited partnership of which Hayward and Halliday were general partners.
As of May 31, 1961, Lindsay and Crouse and Rodgers and Hammerstein Pictures, Inc. granted 20th Century-Fox Film Corporation a 12-year lease of the motion picture rights in the play. As of the same day, 20th Century Fox transferred the motion picture sound-track album rights to Rodgers and Hammerstein Records, Inc., a Rodgers and Hammerstein controlled company.
The principals of the Sound of Music Company did not know of the contract concerning the motion picture sound track rights until late in 1965. When it finally came to their attention, the company instituted arbitration proceedings before the American Arbitration Association.
The arbitration took approximately a year, with 22 hearings, 1,800 pages of testimony and 296 exhibits. Thirteen witnesses testified; sundry briefs were submitted. Eminent counsel represented the respective parties. In his award, dated August 20, 1967, the arbitrator found that the Sound of Music Company was entitled to share in the sound track album rights and that the making of the contract transferring these rights to Rodgers and Hammerstein Records, Inc., and its concealment from the Sound of Music Company, constituted willful misconduct on the part of Rodgers and Hammerstein.
He directed Rodgers and Hammerstein to pay the Sound of Music Company for sales in the domestic market as of March, 1967, and for sales in the foreign market as of April, 1967. For sales made thereafter, the Sound of Music Company was granted an award of 36.08% of stated royalty receipts or, where appropriate, of net profits from the manufacture, licensing, use or disposition of records, tapes or cartridges made from the sound track.
The award will eventually result in total receipts by the Sound of Music Company of approximately $3,000,000, the largest sum ever awarded in a commercial case administered by the American Arbitration Association.
*701 The award was confirmed by order of this court dated April 24,1968. Upon appeal, the order was affirmed by the Appellate Division (Matter of Sound of Music Co. v. Rodgers, 30 A D 2d 935). Leave to appeal was denied by the Court of Appeals (Matter of Sound of Music Co. v. Rodgers, 23 N Y 2d 642, 742).
Fitelson and Mayers, Esqs., represented the Sound of Music Company in the arbitration proceeding and in the courts. They acted under a written retainer agreement dated May 6, 1966, signed in behalf of the Sound of Music Company by Hayward and Halliday. In the retainer agreement the parties agreed that counsel be paid for their services a contingent fee based on the amount recovered by Sound of Music Company from the recording or sale of the sound track phonograph album of the motion picture and of the original stage cast phonograph album.
CHARACTER OF THE ACTION:
In June of 1970, Rodgers and Hammerstein, as limited partners with a 25% interest in the Sound of Music Company, brought this action to rescind the contingent retainer agreement and to determine the value of the services of Fitelson and Mayers, Esqs., on the basis of quantum meruit.
The complaint in the main contended that by reason of Rodgers and Hammer stein’s 25% beneficial interest in the Sound of Music Company and Lindsay and Crouse’s 6% (actually 11%) interest in the company, recovery by the attorneys should be reduced by the extent of their interests as both “ debtors ” and “ creditors
On motion, plaintiffs were granted a preliminary injunction against further payments to Fitelson and Mayers, Esqs. Defendants in turn were given the right to an immediate trial 10 days after the filing by defendants of a note of issue and statement of readiness. Pursuant to the order, the case came before me for trial in March of 1972.
On March 28, 1972, counsel for plaintiffs, counsel for defendants Fitelson and Mayers, Esqs., and counsel for Sound of Music Company, entered into a written stipulation of settlement, subject to the approval of the court. By my order dated March 29, 1972, a hearing, pursuant to section 115-a of the Partnership Law, on the fairness and adequacy of the proposed settlement was scheduled for April 12,1972. Notice of the hearing, together with a copy of the stipulation of settlement, were mailed to all Sound of Music Company partners and participants. On April 12, 1972, testimony and exhibits were offered in support of the proposed settlement; no one appeared in opposition.
*702 CONSENTS TO THE PROPOSED SETTLEMENT:
The settlement will result in the reduction of the contingent fee fixed by the parties by 10%.
Plaintiffs have consented to the settlement. Richard Halliday, the surviving general partner of defendant the Sound of Music Company has also approved the settlement.
Mr. Halliday testified at the hearing. He stated that Mr. Hayward and he would not have retained Fitelson and Mayers, Esqs., to bring the arbitration proceeding other than on a contingent basis; that this is a common practice in the theatre. He also stated that the contingency in the retainer agreement met with the approval of Mr. Hayward, as well as his own.
Counsel who brought the action for plaintiff testified that there is little or no prospect of recovery in excess of that provided in the stipulation of settlement; and that under all the circumstances before the court, the settlement proposed was fair and reasonable.
Counsel for the Sound of Music Company stated that after investigation he could see no merit to plaintiffs’ claim “ and certainly saw no basis upon which Sound of Music Company could in good faith, in good conscience, pick it up and assert it ”. He concluded that he “ saw no basis upon which the Sound of Music Company could take any position that this fee had not been earned and should not be paid in any respect.”
This much is abundantly clear. The conduct of Fitelson and Mayers, Esqs., and of Halliday and Hayward in pressing the claim against Rodgers and Hammerstein was exemplary. They are to be commended for their efforts in retrieving the moneys due the Sound of Music Company. Any suggestion to the contrary is both unfair and unfounded.
attorneys’ eees:
Ordinarily an attorney’s compensation is governed by the contract between the parties, express or implied (Judiciary Law, § 474). Unless the retainer is unconscionable or illegal, the parties are bound by the terms they agree to (Rodkinson v. Haecker, 248 N. Y. 480; Greenberg v. Renick & Co., 230 N. Y. 70; Ransom v. Ransom, 147 App. Div. 835; see, also, Booth, Lipton & Lipton v. Cassel, 51 Misc 2d 853, affd. 27 A D 2d 706); and an attorney’s contract with his client for compensation for future services is presumed to be fair until the contrary appears (Rodkinson v. Haecker, supra; Matter of Peters, 271 App. Div. 518, mod. 296 N. Y, 974; Matter of Sasson, 231 App. Div. 524).
*703 If, however, the contract is unreasonable or oppressive, the court will correct the abuse (Gair v. Peck, 6 N Y 2d 97, cert. den. 361 U. S. 374; Matter of Fitzsimons, 174 N. Y. 15).
A contingent contract, dependent upon the attorney’s success in obtaining a recovery, is valid and enforceable (Fowler v. Callan, 102 N. Y. 395). Indeed, the right of an attorney to make a contract fixing his compensation as a percentage of the amount recovered, is well settled. The courts will protect counsel’s right to the percentage agreed upon, unless he has forfeited his right to compensation by misconduct, or the agreement was induced by fraud, or the attorney has taken some unconscionable advantage of his client, or the agreement is illegal (Matter of Fitzsimons, supra; Matter of Sasson, supra; Matter of Liebergall, 189 App. Div. 681; Ransom v. Cutting, 112 App. Div. 150, affd. 188 N. Y. 447). The rate of compensation fixed in a retainer agreement will not be condemned merely because the contingency seems inordinately large, unless it is so excessive as to evince a purpose on the part of the attorney to take improper or undue advantage of his client (Weeks v. Gattell, 125 App. Div. 402, affd. 193 N. Y. 681; see, also, Burke v. Baker, 111 App. Div. 422, affd. 188 N. Y. 561; Sea Isle Foods v. State of New York, 40 Misc 2d 872).
The cases to this effect rest on firm logical foundation. Professional services to be paid for on a contingency are rendered at the attorney’s peril. When the rate is fixed the extent of the services thereafter to be rendered required to bring about a recovery cannot be forecast with precision (Morehouse v. Brooklyn Heights R. R. Co., 123 App. Div. 680, affd. 195 N. Y. 537; Murray v. Waring Hot Mfg. Co., 142 App. Div. 514).
APPBOVING OB DISAPPBOVING A SETTLEMENT:
Section 115-a of the Partnership Law sets forth no standard for passing on proposed settlements of derivative actions (see, also, CPLR 1005; Lichtyger v. Franchard Corp., 18 N Y 2d 528; Riviera Congress Assoc, v. Yassky, 18 N Y 2d 540). Decisions in related fields, however, point the way (Zenn v. Anzalone, 17 Misc 2d 897; Waterman Corp. v. Johnston, 106 N. Y. S. 2d 813, affd. 279 App. Div. 1073; Silverstein v. Clarkson, 194 Misc. 1046).
Eight guiding principles evolve from a study of the authorities : (1) The benefits in the agreement of settlement, as against the likelihood of recovery after trial. (2) The general rule that courts favor settlements. (3) Whether sharply contested and dubious issues are present, the determination of which would be obviated by the settlement. (4) The expense of going to trial. (5) The likelihood of success at the trial. (6) Whether the settle *704 ■ment is the result of good faith negotiation at arms length, or of collusion, chicanery or fraud. (7) The position of the parties to the litigation concerning the settlement; the opposition, if any, to the settlement. (8) Whether, in the court’s judgment, the settlement is fair and reasonable under all the circumstances.
As well put in Shielcrawt v. Moffett (59 N. Y. S. 2d 619, 621), the court, however, is not required "to balance the scales with the nicety of an apothecary ’ ’.
conclusion :
Judged in the light of these rules, the conclusion is inescapable that the proposed 'settlement should be approved.
The retainer under study was made with specialists in theatrical matters. The efforts of counsel were successful; the award they obtained for their client was full and abundant. For these efforts they are entitled to be paid.
All personally concerned in the case who have appeared before the court have approved the terms of the settlement and urged its acceptance. No one has urged its rejection; no one has opposed any of its terms or any of its provisions.
The settlement was hammered out by experienced attorneys of high standing. By the settlement all the parties have surrendered something; all have gained something; an extended trial has been avoided. The compromise reached is satisfactory to those who appeared at the hearing. No one has argued that it is not satisfactory.
Consequently, there is no purpose in further litigating the sharply-contested issues presented by the pleadings.
In this frame of reference I approve the stipulation of settlement, as modified at the hearing.